[No. B150712. Second Dist., Div. Seven. July 22, 2002.]

CRAIG OGBORN et al., Plaintiffs and Appellants, v.
CITY OF LANCASTER et al., Defendants and Respondents.

## COUNSEL

Duchrow & Barker and David J. Duchrow for Plaintiffs and Appellants.

Stradling Yocca Carlson & Rauth, Douglas J. Evertz and Allison E. Burns for Defendants and Respondents.

## OPINION

**PERLUSS, J.**—Plaintiffs Craig and Kayla Ogborn sued the City of Lancaster (City) and individual city officials for various claims arising out of the City's demolition of their rented home and its contents as part of a nuisance abatement program. The trial court granted summary judgment in favor of all defendants on the ground of qualified governmental immunity. We reverse the judgment in part and affirm in part.

### FACTUAL AND PROCEDURAL BACKGROUND

The Ogborns lived in a rented white stucco house on a 10-acre parcel in the City. The owner of the property, Donald Miller, Sr., also lived on the parcel in a mobilehome. The exterior portions of Miller's property had for years contained large amounts of rubbish, junked vehicles and other unsightly conditions. The City ordered Miller to clean up his property and

abate nuisance conditions in 1991. Miller did not comply, and the City took no further action for several years.

In January 1998 the City began an extensive nuisance cleanup program. Brian Hawley was the director of the City's Department of Community Development, charged with administering the program. Brian St. John was a code enforcement officer in the program. Miller's property (the Property) was identified as one of the properties to be cleaned up.

St. John and another code enforcement officer, Michael Tebbs, inspected the Property in March 1998 and determined that nuisance conditions existed, including abandoned and wrecked vehicles, abandoned or broken salvage materials, illegal storage areas, stagnant water and deposits of garbage and waste materials visible from the public right of way. The Ogborns' rented home, which was apparently the only structure on the Property, was described as "deteriorated." The interior of the structure was not inspected.

On April 8, 1998, Hawley advised Miller by letter that a public nuisance existed on his property, consisting of, inter alia, "[a]n unsafe building or structure as defined in the Uniform Building Code." A public nuisance hearing was held on April 30, 1998, with Hawley acting as the hearing officer. Miller appeared at the hearing and disputed several of the charges. As a result of the hearing, Hawley determined a nuisance existed and sent Miller a letter to that effect, headed "Order of Abatement," on May 29, 1998. The letter included photographs of the nuisance conditions and explained that he had written on the back of each photograph the actions required to abate the conditions shown.[1] It ordered Miller to "abate [the] nuisance by demolition of the structures, removal of all materials, vehicles and miscellaneous equipment as identified on each photograph and the clearing of this accumulation from your property by June 30, 1998." The letter further stated, "Failure to comply with this order will result in the City taking action to abate the nuisance."

Miller appealed Hawley's decision to the city council. On the appeal form, Miller designated three people to whom future notices regarding the matter should be sent. Neither Craig nor Kayla Ogborn was so designated.

Hawley prepared a staff report for the August 11, 1998, appeal hearing before the city council. The report noted Miller had been ordered to abate the

---

[1]While the letter and photocopies of the photographs are part of the record on appeal, the record does not contain copies of any writing on the back of the photographs.

nuisance, including "demolition of all structures," by June 30, 1998.[2] Miller appeared before the city council on August 11, 1998, and told the council he was dying of cancer and needed additional time to correct the nuisance conditions. Craig Ogborn attended the appeal hearing on August 11, 1998 and spoke on Miller's behalf. He also submitted a letter to the city council in which he stated, in part, "[i]f your plans as I understand them commence, all I have in the world will be taken from me as will my future."

After hearing Miller's appeal, the city council passed a resolution stating that the Property "exhibits conditions of public nuisances," including "dilapidated buildings and structures," which it directed the city to abate "by demolition and removal from the premises." The council did, however, extend Miller's time to abate the nuisance for 60 days from August 11, 1998. Miller died on August 28, 1998, without having taken action to abate the nuisance conditions.

On October 8, 1998, Tebbs visited the Property with demolition contractor Harold King as part of a prebid walkthrough. King testified that Tebbs had a conversation with Ogborn in which Ogborn was advised the demolition and cleanup would take place within the next few days. However, Ogborn testified that, while he saw King on the Property on October 8, he did not see or speak to Tebbs on that occasion.

On October 12, 1998, Tebbs and St. John posted a no-entry notice on the locked front gate to the Property. The notice advised the occupants of the Property that they must be off the premises by 6:00 a.m. on October 13, 1998. The Ogborns testified they did not see the no-entry notice.

On the morning of October 13, 1998 Tebbs prepared a declaration in support of an inspection and abatement warrant and presented the declaration to Judge Randolph A. Rogers of the Los Angeles Municipal Court. Judge Rogers executed an inspection and abatement warrant, which permitted the City to enter the Property "to inspect, investigate, search and abate the public nuisance thereon." The warrant specifically authorized the City to "Remove the unpermitted, unsafe and substandard structures from the property . . . . [¶] . . . Remove derelict and inoperable vehicles, trash, debris, and discards from the yard areas of the property . . . [¶] [and r]emove dead trees, leaves, branches and overgrown weeds which constitute a potential fire hazard."

While Tebbs was obtaining the warrant, St. John was briefing members of the Los Angeles County Sheriff's Department about the anticipated nuisance

---

[2]Ogborn admitted he saw this report at the city council hearing or immediately afterwards.

abatement action. About 8:00 a.m., Tebbs, St. John and the deputies went to the Property. They forcibly removed the Ogborns from their home[3] and bulldozed the entire area, including the Ogborns' home and all their belongings.

The Ogborns sued the City, Hawley and St. John for violation of their civil rights and related claims arising out of the City's alleged failure to provide due process before destroying their home and belongings. They alleged causes of action for deprivation of civil rights under 42 United States Code section 1983 (hereinafter section 1983), conspiracy to deprive them of civil rights under 42 United States Code section 1985 (hereinafter section 1985), deprivation of civil rights pursuant to article I, section 1 of the California Constitution, trespass and conversion.

All defendants moved for summary judgment, arguing that the Ogborns' claims were barred because (a) their home was destroyed pursuant to valid nuisance abatement procedures including the final warrant; (b) even if the warrant was invalid, defendants reasonably relied on it and so were entitled to qualified immunity; and (c) the immunities in Government Code section 820.2 et seq.[4] protected them from liability.

The trial court granted defendants' motion, finding they were entitled to summary judgment on the ground of qualified immunity because the Ogborns' home had been destroyed pursuant to a valid warrant. The Ogborns timely appeal from the judgment.

DISCUSSION

1. *Standard of Review.*

The standard of review on appeal after an order granting summary judgment is well settled. "A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ▮ We review the trial court's decision de novo, considering all of the evidence the

---

[3]Craig Ogborn was arrested on an outstanding warrant and placed in a police patrol car. His request to reenter the house and retrieve his belongings was denied, and he ultimately asked St. John to retrieve only his "medicine and money." Kayla Ogborn was removed from the house at gunpoint and transported to the Antelope Valley Hospital for admission as a mentally disordered person under Welfare and Institutions Code section 5150. She was discharged immediately after seeing a doctor and returned to the scene before the bulldozing actually took place.

[4]All further statutory references are to the Government Code unless otherwise indicated.

parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) In the trial court, once a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' (Code Civ. Proc., § 437c, subd. (*o*)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854-855 [107 Cal.Rptr.2d 841, 24 P.3d 493].)" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476-477 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

In reviewing the evidence, we strictly construe the moving party's evidence and liberally construe the opposing party's and accept as undisputed only those portions of the moving party's evidence that are uncontradicted. "Only when the inferences are indisputable may the court decide the issues as a matter of law. If the evidence is in conflict, the factual issues must be resolved by trial. 'Any doubts about the propriety of summary judgment . . . are generally resolved *against* granting the motion, because that allows the future development of the case and avoids errors.' [Citation.]" (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839 [89 Cal.Rptr.2d 540]; see also *Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1365 [27 Cal.Rptr.2d 681] ["doubts as to the propriety of granting the motion should be resolved in favor of the opposing party"].)

## 2. *The Individual Defendants Are Entitled to Qualified Governmental Immunity.*

Section 1983 provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." Section 1985 provides liability for those who conspire to deprive any person of his or her civil rights.[5] A plaintiff seeking to recover from a government official under these statutes must show the right in question was clearly established at the time of

---

[5]The parties, like the trial court, assume without citation of authority that the qualified immunity analysis for section 1983 claims applies equally to the Ogborns' section 1985 claim and their purported cause of action for violation of the California Constitution. That assumption appears correct. (See, e.g., *Zisk v. City of Roseville* (1976) 56 Cal.App.3d 41, 50-51 & fn.

the alleged violation. (*Davis v. Scherer* (1984) 468 U.S. 183, 197 [104 S.Ct. 3012, 3021 82 L.Ed.2d 139].) Otherwise, the doctrine of "qualified immunity" shields public employees from civil liability if they could reasonably have believed their actions were consistent with the right alleged to have been violated. (*Anderson v. Creighton* (1987) 483 U.S. 635, 638 [107 S.Ct. 3034, 3038, 97 L.Ed.2d 523].)

The Ogborns' first, second and third causes of action seek damages for an alleged violation of their right to due process of law before the City destroyed their property. ▉ Due process principles, under both the state and federal Constitutions, require reasonable notice and an opportunity to be heard before the government deprives a citizen of a significant property interest. (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612 [156 Cal.Rptr. 718, 596 P.2d 1134]; *United States v. James Daniel Good Real Property* (1993) 510 U.S. 43, 48 [114 S.Ct. 492, 498, 126 L.Ed.2d 490].) ▉ The individual defendants contend they reasonably relied on the inspection and abatement warrant issued by Judge Rogers and therefore cannot be liable for bulldozing the Ogborns' home and belongings even if the Ogborns' constitutional rights were violated. We agree. The warrant authorized the City to enter the Property and "to inspect, investigate, search and abate the public nuisance thereon. Specifically, the Community Development Director or his designee, through city forces or by private contractor shall enter the property to: [¶] Remove the unpermitted and unsafe structures from the property."

Both Craig and Kayla Ogborn submitted declarations in which they stated that "[a]t all times while we lived on the property, our house was habitable. The electricity, plumbing, water, and telephones were all in working order and fully functioning. The sinks, bathtub and toilet worked. There was adequate heating. There was proper ventilation. There was sufficient natural light. Electrical lighting was throughout the house. The windows were all maintained. All entries to the house were secure. There were no infestations of insects, rodents, or vermin. The house was connected to a sewage disposal system, utilizing a septic tank system. The foundation and flooring and floor supports were buckled. The ceiling and roof, along with all other supports, were adequate. No wiring problems existed. There were no broken windows; when they broke, I fixed them." While this evidence might raise a question of fact as to whether the Ogborn home was *in fact* "unpermitted, unsafe, and substandard," the record is clear that the nuisance proceedings that culminated in issuance of the warrant included findings that the Property contained "dilapidated buildings and structures" that constituted a nuisance. The

---

3 [127 Cal.Rptr. 896] [applying same standard of immunity to claims under §§ 1983 and 1985 and observing that California's standard of immunity would produce a "similar result"].)

Ogborns' home was the only "building" or "structure" on the Property. Accordingly, there is no triable issue as to whether it had been adjudged a nuisance and ordered demolished.

Although the warrant at issue is for nuisance abatement, rather than search and seizure of criminal evidence, the legal principles applicable to search warrants are instructive in this case. ■ "Law enforcement officers are entitled to qualified immunity if they act reasonably under the circumstances, even if the actions result in a constitutional violation. [Citations.] . . . The officers who lead the team that executes a warrant are responsible for ensuring that they have lawful authority for their actions. A key aspect of this responsibility is making sure that they have a proper warrant that in fact authorizes the search and seizure they are about to conduct." (*Ramirez v. Butte-Silver Bow County* (9th, Cir. 2002) 283 F.3d 985, 990, fn. omitted.) ■ Here, there is no dispute that the warrant authorized the demolition of the Ogborns' home, which was, after all, the only structure on the Property. Because St. John indisputably led the team, he is entitled to qualified immunity.[6]

Hawley's participation in the demolition of the Ogborns' home was even more attenuated than that of St. John. The undisputed facts establish that Hawley conducted the initial hearing at which Miller's property was declared a public nuisance and that decision was upheld by the city council at the appeal proceeding on August 11, 1998. Hawley gave proper notice of the proceedings to the owner of the Property and his designees, and he also saw Ogborn participate in the August 11 hearing and received a letter from Ogborn that could reasonably be construed as acknowledgement that the City was going to bulldoze the house. Moreover, at all relevant times, Ogborn assured Hawley that he planned to be out of the Property by mid-September at the latest. We cannot say that Hawley reasonably should have known the Ogborns' constitutional rights were violated. Accordingly, he, too, is entitled to qualified immunity.[7]

---

[6]St. John would also be entitled to qualified immunity even if he were a "line officer" rather than the "team leader." (*Ramirez v. Butte-Silver Bow County, supra*, 283 F.3d at p. 990 ["Line officers, on the other hand, are required to do much less. They do not have to actually read or even see the warrant; they may accept the word of their superiors that they have a warrant and that it is valid."].)

[7]As an alternative to its qualified immunity defense, the City contends the Ogborns did in fact receive due process before their home and belongings were bulldozed. However, triable issues of fact exist as to whether they had adequate notice and an opportunity to respond. The Ogborns deny having actual notice that their home would be bulldozed before they had a chance to remove their belongings. Moreover, there is evidence the City failed to comply with Health and Safety Code section 17980, which requires notice to tenants when nuisance abatement proceedings are instituted with respect to a residential building.

3. *The "Discretionary Acts" Immunity in Section 820.2 Bars the Ogborns' Tort Claims Against Hawley, but Not Against St. John.*

■  The doctrine of qualified governmental immunity is a federal doctrine that does not extend to state tort claims against government employees. (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 755-756 [63 Cal.Rptr.2d 842, 937 P.2d 273] ["Governmental immunity for claims of violation of civil rights under section 1983 is not conferred expressly by statute, but is based upon a judicial gloss on section 1983," whereas "governmental immunity under California law is governed by statute."].)
■  However, the individual defendants contend they are shielded from liability by various state statutory immunities. Section 820.2 provides: "[A] public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." We agree this section renders Hawley immune from the Ogborns' state law tort claims for trespass and conversion, but disagree as to St. John.

*Johnson v. State of California* (1968) 69 Cal.2d 782, 793 [73 Cal.Rptr. 240, 447 P.2d 352] (*Johnson*), the leading case interpreting section 820.2, held that discretionary act immunity applies only to " '*basic policy decisions.*' " In *Johnson*, a government official placed a " '16 year old boy with homicidal tendencies' " in Mrs. Johnson's home as a foster child and failed to warn her of the child's " 'dangerous propensities,' " even though the placement officer had notice of the danger. After five days in Mrs. Johnson's home, the boy assaulted and injured her. (*Id.* at pp. 784-785.) Mrs. Johnson sued the state, alleging the state " '[should] have told me I was getting a boy with a criminal and delinquent background.' " (*Id.* at p. 785, fn. 1.) The trial court granted summary judgment in favor of the state, on the ground the placement officer's decision whether to warn of the boy's potentially dangerous propensities was a "discretionary act" protected by section 820.2. (*Johnson*, at p. 786.)

The Supreme Court reversed. In construing the scope of section 820.2 immunity, the court held "[a] semantic inquiry into the meaning of 'discretionary' will not suffice as a criterion for interpreting section 820.2." (*Johnson, supra*, 69 Cal.2d at p. 787, italics omitted.) The court instead analyzed the policy underlying a grant of immunity to determine what conduct should be protected by section 820.2. " 'Since obviously no mechanical separation of all activities in which public officials may engage as being either discretionary or ministerial is possible, the determination of the category into which a particular activity falls should be guided by the purpose of the discretionary immunity doctrine.' " (*Johnson*, at p. 790,

quoting *Ne Casek v. City of Los Angeles* (1965) 233 Cal.App.2d 131, 135 [43 Cal.Rptr. 294].)

The court held section 820.2 provides immunity for "basic policy decisions," but not "for the ministerial implementation of that basic policy." (*Johnson, supra,* 69 Cal.2d at p. 796.) The court explained this distinction might also be characterized as "between the 'planning' and 'operational' levels of decision-making." (*Id.* at p. 794.) It noted "[a]ny wider judicial review . . . would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government." (*Id.* at p. 793.)

Using this analysis, the court held the decision to place the boy in the Johnsons' home was a "basic policy decision," but the decision whether to warn them of his violent propensities was ministerial. (*Johnson, supra,* 69 Cal.2d at p. 786.) "[A]lthough a basic policy decision (such as standards for parole) may be discretionary and hence warrant governmental immunity, subsequent ministerial actions in the implementation of that basic decision still must face case-by-case adjudication on the question of negligence." (*Id.* at p. 797.)

In this case, Hawley's actions were unquestionably "discretionary" as that term is defined in *Johnson, supra,* 69 Cal.2d 782. The Ogborns alleged in their complaint that Hawley was the director of the Department of Community Development, which was charged with administering the City's nuisance abatement program. Hawley conducted the initial hearing at which Miller's property was declared a public nuisance, and he sent a letter to Miller to that effect on May 29, 1998. There is no allegation and no evidence that he participated in any way in obtaining the warrant or bulldozing the Ogborns' home. To the contrary, it is undisputed that Hawley was out of state on vacation from October 9 to October 19, 1998. In short, Hawley's participation in this matter was limited to making the discretionary policy decision to declare the Property a nuisance. Accordingly, section 820.2 bars the Ogborns' trespass and conversion claims against him.

By contrast, the evidence establishes that St. John actively participated in the *implementation* of the nuisance abatement program with respect to the Property. He was present at the Property on October 13, 1998, and personally gave the order for the bulldozer to demolish the Ogborns' house. These actions constituted "subsequent ministerial actions in the implementation of the basic decision" to declare the Property a nuisance, and thus section 820.2 does not bar the Ogborns' tort claims against St. John.

### 4. *Section 821.8 Bars the Ogborns' Trespass Claim Against St. John.*

Section 821.8 provides that public employees are not liable for an entry onto property where the entry is under the express or implied authority of law. This immunity provision bars the Ogborns' claim for trespassing because the warrant clearly authorized entry onto the Property and into the structures located there. However, this immunity provision does not bar the Ogborns' claim for conversion of their belongings, which were not within the scope of the warrant.

### 5. *The Other Cited Statutory Immunities Do Not Bar the Ogborns' Conversion Claim Against St. John.*

Section 822.2 provides, "A public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice." One of the allegations in the complaint is that Tebbs misled Judge Rogers by omitting references to the Ogborns' occupancy of the Property in the affidavit submitted in support of the warrant. However, the Ogborns' tort claims are for trespass and conversion, not fraud or misrepresentation. The gravamen of the claims is breach of defendants' duty to provide notice and a hearing before entering and destroying the Ogborns' home and belongings. (*Tallmadge v. County of Los Angeles* (1987) 191 Cal.App.3d 251, 254 [236 Cal.Rptr. 338] [conversion claim based on failure to provide due process is not barred by § 822.2].) At the very least, there is a question of fact as to whether a misrepresentation "caused" the Ogborns' injury. Therefore, summary judgment based on section 822.2 is not appropriate.

Section 820.4 provides, "A public employee is not liable for his act or omission exercising due care, in the execution or enforcement of any law." Because the warrant expressly authorized St. John to enter the Ogborns' home, he is entitled to immunity under section 820.4 with respect to their claim for trespass. However, this statute does not support summary judgment as to the Ogborns' conversion claim because a question of fact exists as to whether St. John's reliance on the warrant constituted "due care" with respect to the handling of the Ogborns' personal property. The Ogborns presented evidence that St. John stymied their efforts to save their personal property, and a trier of fact could find he failed to exercise due care when he ordered the bulldozers to go ahead without giving the Ogborns a chance to retrieve their belongings.

Section 821.6 provides that public employees are "not liable for injury caused by . . . instituting or prosecuting any judicial or administrative proceeding within the scope of his [or her] employment, even if [they]

act[] maliciously and without probable cause." Defendants argue the nuisance abatement process was an administrative proceeding, and therefore this immunity bars the Ogborns' tort claims. Certainly, this section would apply to Hawley's actions in instituting and prosecuting the nuisance proceedings. However, it does not bar the conversion claim against St. John.

Section 821.6 immunity is intended to prevent malicious prosecution actions against government officials and does not apply where, as here, the tort complained of occurred *after* the judicial or administrative proceeding has been completed. (*Tallmadge v. Los Angeles County, supra,* 191 Cal.App.3d at pp. 253-255 [§ 821.6 does not bar claim for conversion of weapons seized when plaintiff was arrested for unlawful possession of weapons].) In this case, the Ogborns do not complain that St. John acted improperly with respect to the proceedings that declared the Property a nuisance. Their complaint is that their belongings, which were *not* a part of those proceedings, were tortiously destroyed. Therefore, section 821.6 does not support the summary judgment on the Ogborns' conversion claim.

6. *The Trial Court Erred in Granting Summary Judgment in Favor of the City on the First, Second and Fourth Causes of Action.*

The trial court concluded, without citation to authority, that the City was entitled to qualified governmental immunity to the same extent as the individual defendants. This was error. The federal qualified immunity defense protects individual officers, not municipalities or other governmental entities subject to suit under sections 1983 and 1985. (*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit* (1993) 507 U.S. 163, 166 [113 S.Ct. 1160, 1162, 122 L.Ed.2d 517, 523]; *Owen v. City of Independence* (1980) 445 U.S. 622, 638 [100 S.Ct. 1398, 1409, 63 L.Ed.2d 673, 685-686].)

The City, of course, cannot be held liable under section 1983 for an injury caused solely by its agents or employees in the absence of a City policy, official decision or custom. (*Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 694 [98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638]; *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 881 [271 Cal.Rptr. 513].) However, the City did not move for summary judgment on the ground that the Ogborns' injuries were *not* the result of an official City act. To the contrary, the City acknowledges the city council passed a resolution finding the Property to be a nuisance and ordering its abatement. "Local governmental entities ' "can be sued directly under § 1983 for monetary, declaratory, or

injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted . . . ." ' [Citations.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1147 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) ▉ ■ ■ In its motion for summary judgment, the City failed to establish the Ogborns could not " 'demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' " (*Ibid.*) Accordingly, it was error to grant summary judgment in favor of the City on the Ogborns' due process claims.[8] ▉ At the very least, triable issues of fact remain on this issue.

▉ Finally, the City argues it is not liable for an injury resulting from an act or omission of an employee where the employee *is immune* from liability under state law. (§ 815.2, subd. (b); *Masters v. San Bernardino County Employees Retirement Assn.* (1995) 32 Cal.App.4th 30, 39-40 [37 Cal.Rptr.2d 860].) Because the Ogborns' trespass claim is barred by the statutory immunity in section 821.8 as to the individual defendants, it is also barred as to the City. However, as discussed above, the City may still be liable for conversion because St. John is not immune from liability on that claim.[9]

## DISPOSITION

The judgment of the trial court is affirmed as to Brian Hawley. The judgment as to Brian St. John and the City is reversed. On remand, the trial court is directed to vacate its order granting summary judgment in favor of St. John and the City and to enter a new and different order granting in part St. John's alternative motion for summary adjudication of issues as to the first, second, third and fifth causes of action only and granting in part the City's alternative motion for summary adjudication of issues as to the third and fifth causes of action only and thereafter to conduct further proceedings

---

[8]Although the Ogborns' sections 1983 and 1985 claims against the City must be reinstated at this point, there is no cognizable damage action under the California Constitution for alleged deprivation of property without due process (*Carlsbad Aquafarm, Inc. v. State Dept. of Health Services* (2000) 83 Cal.App.4th 809, 818 [100 Cal.Rptr.2d 87]), at least when alternative damage remedies are available, as they are in this case. (*Bonner v. City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1477 [53 Cal.Rptr.2d 671] [right to sue city for conversion is an effective alternative judicial remedy precluding direct cause of action for violation of the due process clause of the state Constitution].) This purely legal issue is properly decided on appeal from the trial court's decision granting summary judgment, since we are obligated to examine the facts independently and determine their effect as a matter of law. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76 [115 Cal.Rptr.2d 3].)

[9]The Ogborns' evidentiary objections relate to evidence that would not change our decision. Accordingly, we do not address them.

not inconsistent with this opinion. The Ogborns shall recover their costs on appeal from the City. Hawley shall bear his own costs on appeal.

Lillie, P. J., and Woods, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 16, 2002.